## Appeal of THATCHER MEDICINE CO.

Docket No. 3904.    Submitted September 1, 1925.    Decided November 24, 1925.

> 1. Reserves set up to meet a liability in part contingent are not legal deductions from gross income.
> 2. A corporation which erects a building on land rented month by month from its principal stockholder is not entitled to deduct from gross income of the year in which the building is erected the full cost of the building under the conditions herein stated.

*Morris D. Kopple, Esq.*, for the taxpayer.
*Lee I. Park, Esq.*, for the Commissioner.

Before SMITH, LITTLETON, and TRUSSELL.

This appeal is from the determination of deficiencies in income and profits tax for the years 1918, 1919, and 1920, in the net amount of $12,018.66. The deficiency determined for the year 1918 is $14,650.83, against which there have been applied overassessments for the years 1919 and 1920 in the amounts of $1,536.49 and $1,103.68, respectively. The principal questions raised by the appeal are:

1. The jurisdiction of the Board relative to the consideration of tax liability for the years 1919 and 1920.

2. The right of the taxpayer to deduct from gross income reserves for freight on sales and for advertising signs in excess of the amounts allowed by the Commissioner.

3. The deduction from gross income of the year 1920 of $14,873.57, representing the cost of certain improvements and betterments made by the taxpayer upon property which it rents month by month from its secretary and treasurer.

### FINDINGS OF FACT.

The taxpayer is a Tennessee corporation with principal office and place of business at Chattanooga. It is a manufacturer and wholesaler of patent medicines. It was incorporated in 1896. It has on its books accounts with many thousands of customers. It solicits business principally in the Southern States through salesmen. It does its advertising through newspapers, sign billboards, mail lists, samples, etc. Its goods are usually sold on from four to six months' time.

Its usual method of transacting business during the years 1918, 1919, and 1920, was to ship goods to a dealer on a written order. The orders taken by salesmen were on blank forms, one of which was submitted in evidence. This provides, among other things, that "no conditions recognized unless specified in this order; no countermand accepted." "We agree to pay in full on —— or remit within 30 days from date of invoice less —— per cent discount." "Freight ——." On the exhibit, which was an order received from a customer, there was written in pencil after the word freight "allowed"; also "send 20 signs allow 5 cts. each for tacking up."

Goods were billed to the purchasers at the invoice price less the trade discount provided in the order. The freight was never prepaid but was always paid by the consignee. Where the order specifically provided that the freight was "allowed," the purchaser had the right in making payment to deduct from the amount of the bill the amount of the freight paid, and where the order also provided that the purchaser was to be allowed 5 cents each for the tacking up of signs, he had the right to deduct 5 cents for each of the signs tacked up.

At the close of each of the years 1918, 1919, and 1920, the taxpayer recognized a liability in respect of freight which might be paid by customers and deducted from remittances receivable in the future; also for the tacking up of signs. To take care of these liabilities the taxpayer, at the close of the calendar years 1918, 1919, and 1920, set up reserves in respect of sales made during those years. The amounts of reserves set up for freight on sales and the amounts allowed by the Commissioner for the tax years in question were as follows:

|      | Reserve claimed. | Reserve allowed. |
|------|------------------|------------------|
| 1918 | $6,900.00        | ---------        |
| 1919 | 7,636.26         | $6,900.00        |
| 1920 | 8,045.46         | 7,636.26         |

The amounts of reserves set up for "advertising signs" and the amounts allowed were:

|      | Reserve claimed. | Reserve allowed. |
|------|------------------|------------------|
| 1918 | $630.00          | ---------        |
| 1919 | 1,500.00         | $630.00          |
| 1920 | 1,507.80         | 1,500.00         |

Of the reserve for freight on sales set up at December 31, 1918 ($6,900), the amount claimed by purchasers in 1919 was $2,210.57, and in 1920, $9.01; of that set up at December 31, 1919 ($7,636.26), the amount accounted for in 1920 was $2,849.13, and in 1921, $12.67; of that set up at December 31, 1920 ($8,045.46), the amount accounted for in 1921 was $1,514.20, and in 1922, $2.86. The reserve for advertising signs set up at December 31, 1918, was $630 and the amounts claimed by purchasers in 1919 and 1920 were $533.30 and $1, respectively; of that set up at December 31, 1919 ($1,500), the amount accounted for in 1920 was $817.38; of that set up at the end of 1920 ($1,507.80), the amounts accounted for in 1921 and 1922 were $578.93 and $1, respectively. Of the reserves on these two accounts set up at the close of the years 1918, 1919, and 1920, only about one-third had been paid out at December 31, 1922.

When bad debts were charged off they were charged off *in toto*, and no deduction was made therefrom in respect of any reserves which had been set up for freight on sales or for advertising signs.

In its tax return for the year 1920, the taxpayer deducted from gross income $14,873.57, which represented the cost of the erection of a warehouse. This warehouse was built upon land owned by the secretary and treasurer of the company, who also owned about one-third of the capital stock. The land was rented to the taxpayer under a tenancy at will. There was no written lease. The taxpayer suffered from a flood in 1917, and in 1918 and 1919 flood water entered its factory. The warehouse was built in order that the supplies kept in rooms that might be affected by flood water could quickly be removed to it.

#### DECISION.

The determination of the Commissioner is approved.

#### OPINION.

SMITH: This appeal raises three questions, as indicated in the preliminary statement.

The deficiency letter sent to the taxpayer under date of March 5, 1925, shows a deficiency in tax for the year 1918 in the amount of $14,658.83, and overassessments for the years 1919 and 1920 in the amounts of $1,536.49 and $1,103.68, respectively. The Commissioner raises a question as to the jurisdiction of the Board to consider the years 1919 and 1920, since no deficiencies have been determined for those years. This Board is of the opinion, however, that the Commissioner has by his deficiency letter determined a deficiency for the three years 1918 to 1920, inclusive, of $12,018.66, and that the

Board has jurisdiction to consider the tax liability of the taxpayer for the three years involved. *Appeal of Banna Manufacturing Co.,* 1 B. T. A. 1037.

The second question is as to the right of the taxpayer to claim, as deductions from the gross income of the years 1918, 1919, and 1920, certain amounts set up as reserves for freight on sales and for advertising signs. In its income-tax returns for the years 1918, 1919, and 1920, the taxpayer deducted $6,900, $7,636.26, and $8,045.46, as reserves for freight on sales, and $630, $1,500, and $1,507.80, as reserves for advertising signs. The Commissioner has disallowed the deduction of the reserve set up for 1918, and has allowed the deduction of rebates on sales of $6,900 and $7,636.26 for 1919 and 1920, respectively. He has also disallowed the deduction of the reserves for advertising signs for 1918, but has allowed the deduction of rebates on sales on account of advertising signs for 1919 and 1920 of $630 and $1,500, respectively.

The evidence relative to the practice of the taxpayer in the computation of its reserves is not at all satisfactory. An officer of the taxpayer testified at the hearing that it was the taxpayer's practice to allow purchasers to pay the freight upon goods ordered, and to deduct from the remittance the amount of freight paid. The reserve for freight on sales set up at the close of each tax year was set up to meet that liability at the close of each year. Where a customer purchased a comparatively large order of goods, the salesman would often agree to send 20 signs, for which the purchaser would be allowed a rebate on the bill of merchandise ordered of 5 cents on each sign for tacking up of same. The evidence is to the effect that the taxpayer's customers did not always avail themselves of the privilege of deducting from remittances made to the taxpayer the freight which they had paid or the amount to which they might be entitled for the tacking up of signs. The experience of the company is shown to have been to the effect that not to exceed one-third of the reserve set up against freight on sales for each year was deducted by customers in the succeeding year, and that only a negligible amount was deducted in the second year. The result was, therefore, that at the end of 1920 a large part of the reserve that was set up by the taxpayer at the close of 1918 for freight on sales and for advertising signs had not been availed of by customers during the two succeeding years. The taxpayer claims, however, that the liability still existed, and that it was impossible to state how soon or when the liability would be liquidated.

The taxpayer now claims that the correct amounts of reserves which should have been set up for freight on sales for the years 1918, 1919, and 1920, were $9,189.45, $13,142.48, and $12,524.70,

respectively, and that the corresponding amounts which should have been set up as reserves for advertising signs were $1,745.50, $2,863.50, and $2,223. These amounts have been arrived at by a very exhaustive study of the taxpayer's records by a certified public accountant. The taxpayer has in excess of 18,000 customers and a card is kept for each individual customer. Data were taken from these cards showing the sales to the several customers for each of the years 1918, 1919, and 1920, and the amount of freight which must have been paid by the customers upon those goods. The computation has been made upon the basis that each customer has claimed, or will eventually claim, the credit to which he may be entitled in respect of his purchases. The same method was followed with respect to determining what the taxpayer claims was the correct reserve for advertising.

We are of the opinion that the claim of the taxpayer with reference to reserves is without merit. Although it would appear that in many cases, if not in all, the customer was permitted to deduct from his remittance on a bill of goods the freight that he had paid upon the goods, a great many customers did not deduct the freight that they had paid. This was either through inadvertence or because they were not apprised of the fact that they had the right to make the deduction. The same would also appear to be true with respect to the advertising signs. Either the signs were not tacked up and the amount was not claimed, or else inadvertently the customer did not deduct the amount. There is no evidence that the taxpayer ever has been required to pay the full amount of the reserves set up for the years 1918, 1919, or 1920, or that it will ever be required to pay the full amount of those reserves. There is no evidence before us that the taxpayer ever had a liability in excess of the amounts actually paid—far less than that claimed and for two years at least allowed by the Commissioner in each respective succeeding year. Reserves against contingent liabilities such as those of this taxpayer are not legal deductions from gross income. *Appeal of William J. Ostheimer*, 1 B. T. A. 18; *Appeal of Consolidated Asphalt Co.*, 1 B. T. A. 79; *Appeal of Uvalde Co.*, 1 B. T. A. 932; *Appeal of Morrison-Ricker Mfg. Co.*, 2 B. T. A. 1008. Amounts paid out by a taxpayer in settlement of contingent liabilities are proper deductions from gross income. We have no proof that the amounts paid were in excess of the amounts allowed by the Commissioner for the tax years involved.

The third question relates to the right of the taxpayer to deduct from gross income the full amount of the cost of erecting a warehouse upon property occupied by it as lessee. This building was erected by the taxpayer with a full knowledge that it was a tenant at will in respect of the land upon which the building was erected.

The lessor of the land testified, however, that he and the other officers of the corporation knew that the taxpayer would be privileged to occupy and use the building for an indefinite period. In this situation, we are of· the opinion that the amount spent in the construction of the building was not an ordinary and necessary expense of transacting business but was an investment in a building which would be used over a series of years. The amount that the taxpayer is entitled to deduct for 1920 and succeeding years in respect of the building is reasonable depreciation upon it. *Appeal of National City Bank of Seattle*, 1 B. T. A. 139; *Appeal of Sentinel Publishing Co.*, 2 B. T. A. 1211.